STATE OF NORTH CAROLINA v. JAMES SANDERS

No. 110

(Filed 7 February 1978)

**Constitutional Law § 40— appearance at arraignment without counsel—duty of trial court**

Where defendant appeared at arraignment upon the charge for which he was tried without counsel, the trial court was required, pursuant to G.S. 15A-942, to inform defendant of his right to counsel, to give defendant an op-

State v. Sanders

portunity to exercise that right, and to take action necessary to effectuate that right, including making an inquiry into defendant's indigency irrespective of any request by defendant. For failure of the trial judge to determine indigency and appoint counsel to represent defendant if indigent, the judgment must be vacated and a new trial ordered.

APPEAL by defendant under G.S. 7A-30(2) from the decision of the Court of Appeals which found no error in his trial before *Cowper, J.*, at the 19 October 1976 Session of the Superior Court of NASH. The opinion, written by Chief Judge Brock, with Judge Hedrick concurring and Judge Martin dissenting, is reported in 34 N.C. App. 59, 237 S.E. 2d 475 (1977).

Stated chronologically, events pertinent to this appeal are the following:

On 21 April 1976 defendant was arrested upon charges that he had committed the felonies of housebreaking with the intent to commit larceny, and larceny, violations of N.C. Gen. Stats. §§ 14-54(a) and 14-72 (1969). After having been charged in a magistrate's order under G.S. 15A-511 and later released upon a secured bond of $500, defendant made his initial appearance before Chief District Court Judge Carlton on April 23rd as required by G.S. 15A-601. Judge Carlton, *inter alia*, advised him of his right to counsel, and defendant stated that he would employ his own attorney. On June 29th, however, defendant filed a request for court-appointed counsel accompanied by an affidavit of indigency in which he averred that his weekly salary was $100; that he and his wife jointly owned a home in Spring Hope where their two children lived with them; that he owned a 1969 Plymouth automobile; and that he owed $728. On this showing District Court Judge Matthews adjudged defendant not indigent and denied his request for the appointment of counsel.

After a probable cause hearing on 6 July 1976 at which he was not represented by counsel, defendant was bound over to the Superior Court under his same bond. On August 9th the grand jury returned the first indictment against defendant. In two counts it charged that on "___ January 1976": (1) defendant broke and entered the dwelling of Billy Winstead with the intent to commit therein the felony of larceny; and (2) after having unlawfully broken into the Winstead dwelling, defendant

feloniously took and carried away therefrom a Zenith TV having a value of $300.

On August 10th defendant again filed an affidavit of indigency. This time he asserted that he had been "laid off" his job and was unemployed; that he was making payments of $40 per month on his automobile; and that he owed $500-$600 in monthly payments on the house he owned jointly with his wife. On August 10th Judge Smith refused defendant's request for counsel on the ground that he was not indigent.

On 27 September 1976 defendant's case was calendared for trial as "76-Cr-4964, Receiving stolen goods." Defendant came into court "in his own proper person" and entered a plea of not guilty. A jury was selected and impaneled, but before the introduction of any evidence the court declared a mistrial on its own motion. (Presumably the court took this action because the two-count indictment contained no charge of receiving stolen goods, a violation of G.S. 14-71, the crime for which the district attorney intended to try defendant.)

On September 27th the grand jury returned the second indictment against defendant. The first two counts in the second indictment were identical with those of the first indictment. A third count, however, charged that *Billy Winstead* had feloniously received his own Zenith TV of the value of $300, knowing at the time that the TV had been feloniously taken and carried away from his own home pursuant to an unlawful breaking and entering for that purpose. On September 28th another jury was impaneled to try defendant. This time (presumably after reading the indictment) the court of its own motion again declared a mistrial and quashed the bill of indictment before the introduction of any evidence.

On 18 October 1976 the grand jury returned a third bill of indictment. The first two counts in this indictment were duplicates of the prior indictments. In this third indictment, however, the third count charged that on "the ___ day of January 1976" defendant feloniously received one Zenith TV of the value of $300, the property of Billy Winstead, knowing it to have been feloniously stolen from Winstead's residence pursuant to a felonious entering for that purpose.

On the same day the third indictment was returned defendant was arraigned and tried upon the charge of feloniously receiving stolen goods. At the time of his arraignment defendant appeared without counsel and, "in his own proper person," entered a plea of not guilty. At that time Judge Cowper did not inform defendant of his right to counsel or make any inquiry as to why he had no lawyer. Upon the trial both the State and defendant offered evidence.

Evidence for the State tended to show:

Billy Winstead rented a house in rural Nash County in which he kept a Zenith color TV of the value of $300. In January 1976 he left this house closed and locked. Upon his return he found a window open and the TV gone. He reported the theft to the sheriff. Thereafter Deputy Sheriff Reams obtained the TV from Keith Clark and took it to the sheriff's office, where Winstead later identified it as the one which had been taken from his house.

Keith Clark, who was "charged in this matter" and had "entered a plea of guilty," gave testimony for the State which, except when quoted, is summarized below. He said he had not been promised anything for his testimony and had "in no way been forced to testify."

Clark testified that in January 1976 he knew the contents of the Winstead house. Upon encountering defendant on the street in Spring Hope, Clark had asked him if he wanted to buy a color TV for $125. Defendant said he did and told Clark to deliver it at defendant's house in 15 minutes. Clark and one John Batchelor went immediately to the Winstead house, entered through the front door, which they found ajar, and removed the TV. About 40 minutes after having left defendant in Spring Hope they were at defendant's home with the TV. When defendant arrived about 15 minutes later they took the TV into his garage. Defendant tested the television, and then paid Clark $125. Thereafter defendant asked Clark where the TV came from and Clark replied that "it came out of a poker house and [he] didn't think anybody would find out about it." Clark and Batchelor then left and thereafter Clark gave Batchelor $50 of the $125 he had received from defendant. Several weeks later Clark told Deputy Sheriff Reams where the TV was and then took him to defendant's home "to recover the goods."

Deputy Sheriff Reams, as a witness for the State, testified in substance as follows.

In April 1976 his investigation of Winstead's stolen TV led him to Keith Clark, whom he had "picked up in reference to several breaking and enterings." Clark admitted that he and Batchelor had broken into the Winstead house sometime in January, removed the television, and sold it to defendant for $125. After interrogating Clark, Reams took him to defendant's home. Defendant gave them permission to enter and Clark identified the television, which was in a den-kitchen area. Reams took the television to the sheriff's office where Mr. Winstead identified it. "Clark told me," Reams said, "that James Sanders knew the television set was stolen because he told him that he stole it."

At no time during the trial did defendant ever make an objection.

Defendant testified in his own behalf as follows: "I saw Keith Clark in town that morning and he asked me did I want a color TV and I told him yes. When he brought the TV there I asked him how much he wanted for it and he said $125.00. And he said, 'You ain't got nothing to worry about, the TV ain't hot.' Then he brought the TV in the house and I gave him $125.00. And when they come that night to pick up the TV, I told them I didn't know it was stolen, and they said, 'Yes, you do,' and they brought me down here and put me in jail without bond. That is all I've got to say."

On cross-examination, in brief summary, defendant said: He had "never been convicted of anything." He had known Clark all his life. True, he "thought $125.00 was a mighty good price for a working TV color set," but "Clark said he was about to lose his car." Defendant explained that he had kept the TV in his house for two or three months, and he would not have done so had he known it was stolen. Finally, he insisted that Clark did not tell him either that the TV "didn't come out of somebody's house" or that "it came out of a poker house."

John Batchelor, whom defendant called as a witness, testified upon direct examination by defendant as follows:

"It is true that when Keith and I brought the TV to your house that Keith said it 'won't hot.'

"Court: I take it you went there with Clark, is that right?

"Yes, sir.

"Q. What did Clark tell this defendant?

"A. He told him where it come from and told him it won't hot, you know, and he went on and got it then.

"Q. He told him where it came from?

"A. Yes, sir."

On cross-examination by the district attorney, Batchelor said, "All I heard Keith say was that it won't hot. That conversation took place uptown." He also said that he too was charged in this case; that after Clark talked with defendant on the street in Spring Hope he went with Clark to the Winstead house; that Clark went through the window and opened the door; that he then went in and rolled the TV out the door, and that he and Clark then took the TV to Sander's home. There he spent his time in the pasture examining a calf and so he did not know what defendant paid Clark for the TV, but that Clark only gave him $25.

At the conclusion of the evidence arguments to the jury were waived. The judge submitted the case to the jury solely on the issue of defendant's guilt of "nonfelonious receiving of stolen goods." Upon the "verdict that the defendant is guilty of nonfelonious receiving of stolen goods," the court sentenced defendant to a term of two years and he appealed.

*Attorney General Rufus L. Edmisten and Special Deputy Attorney General Myron C. Banks for the State.*

*Moore, Diedrick & Whitaker for defendant appellant.*

SHARP, Chief Justice.

Defendant's assignment of error No. 6 raises the question which is decisive of this appeal: Does the trial judge's failure to comply with the requirements of N.C. Gen. Stats. § 15A-942 (1975) entitle defendant to a new trial? This section provides:

"If the defendant appears at the arraignment without counsel, the court *must* inform the defendant of his right to counsel, *must* accord the defendant opportunity to exercise that

right, and *must* take any action necessary to effectuate the right." (Emphasis added.)

Defendant stressfully contends that the court's failure to comply with this statute denied him his constitutional right to the assistance of counsel for his defense and effectively deprived him of a fair trial. He asserts that had he not been indigent he would have employed counsel as he had originally told Judge Carlton he would do. Further, had he known he could have had his indigency redetermined by the court at any stage of the proceeding as provided by G.S. 7A-450(c) he would have attempted to have done so at his arraignment.

For the reasons hereinafter stated we hold that the court's failure to obey the mandates of G.S. 15A-942 at the time defendant was arraigned upon the charge for which he was tried does entitle defendant to a new trial.

At the time defendant was arrested in April and first indicted in August, the State had no evidence whatever that defendant had committed either the crime of breaking and entering with the intent to commit larceny or the crime of larceny; yet he was charged with both these crimes. Further, notwithstanding that the State's evidence disproved defendant's guilt of these charges, both were again included in the second and third indictments the district attorney sent to the grand jury. It was not until 18 October 1976, the day the district attorney sent the third bill, that defendant finally was charged with the crime of receiving stolen goods. Thus, defendant was first charged with the crime for which he was convicted on the same day he was arraigned and tried. Although the record discloses that on three occasions defendant appeared *pro se* and entered a plea of not guilty each time, it fails to show that the trial judge ever advised him of his right to counsel or inquired as to why he was appearing without counsel as required by G.S. 15A-942.

The State in its brief specifically recognizes "that a defendant is entitled to counsel through each critical stage, including arraignment and trial; that the question of indigency may be determined or redetermined by the court at any stage; that if the defendant appears at arraignment without counsel, the Court must give him the opportunity to exercise that right and take any action necessary to effectuate that right; and that a defendant

may not be called upon to plead until he has had an opportunity to retain counsel or, if he is eligible for assignment of counsel, until counsel has been assigned or waived. G.S. 7A-451(b); G.S. 7A-450(c); G.S. 15A-942; G.S. 15A-1012(a)."

After recognizing the foregoing rights which the State accords every citizen, counsel for the State makes two contentions: He asserts (1) that the court's "failure to observe any of these niceties" did not prejudice defendant; and (2) that since defendant had twice been found not to be indigent, when he appeared at trial without counsel he had made a conscious choice "to tough it out" by representing himself. With reference to contention (1) at this point it suffices to say that in our view defendant was prejudiced by the court's failure to observe these constitutional and statutory "niceties." We interpret State's contention (2) as an argument that when defendant failed to file a third affidavit of indigency and petition for counsel when the third indictment was returned against him, he chose to proceed *pro se* and thus waived his right to the appointment of counsel. We find no merit in this contention. Defendant, a layman, who had twice been denied the appointment of counsel, no doubt thought that a third application would be futile. He could not be expected to know that the question of his indigency could be redetermined at the time of his arraignment on the day his case was called for trial upon an indictment returned that same day. More decisive, however, is the fact that the statute made it the duty of the trial judge, *when defendant appeared at the arraignment without counsel*, to inquire into his indigency irrespective of any request by defendant.

The State, however, declares its "more important" contention to be that the record "affirmatively discloses that defendant was not indigent at the time of the trial." This claim is based solely on the fact that defendant is represented by counsel on this appeal and is presently at liberty (so the State asserts in its brief) under a bond for which a premium was paid.

This contention will not withstand scrutiny. That defendant is now represented by counsel and is out under a premium-paid bond discloses only that a nonindigent has expended money in defendant's behalf. It is not proof that defendant himself was not indigent on October 18th. Likewise, the two orders of June 29th and August 10th adjudging defendant nonindigent are not proof of his status on October 18th. Defendant's two affidavits on these

dates, however, do disclose that his financial condition had changed drastically between June 29th and August 10th. In the interim he had lost his job and was unemployed; he had mortgaged his automobile; and his house payments were in arrears. The State even concedes that whether counsel should have been appointed for defendant on August 10th was "perhaps debatable."

On this appeal, however, we do not debate the August order denying defendant's request for the assignment of counsel. The question is whether defendant was indigent on 18 October 1976, the day he was arraigned and tried without counsel. Now, however, this question cannot be answered because the trial judge then failed to make the inquiries directed by G.S. 15A-942.

In *State v. Morris*, 275 N.C. 50, 165 S.E. 2d 245 (1968), the defendant was convicted of a general misdemeanor and the judge imposed an active prison sentence of 18 months. In the Recorder's Court and in the Appellate Division defendant was represented by counsel, but he was without counsel at the time he was tried by a jury in the Superior Court. On appeal he contended (1) that he was denied his constitutional right to the assistance of counsel because the trial judge did not advise him that if he could not afford an attorney the court would appoint one for him, and (2) that the court erred in proceeding to trial without a specific finding that defendant was not an indigent or that he had knowingly and understandingly waived his right to counsel.

At the time *Morris* was decided the applicable statute, G.S. 15-4.1 (1965) (enacted as a result of the decision in *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. 2d 799 (1963) and repealed by 1969 N.C. Sess. Laws, c. 1013, s. 12), provided: "When a defendant charged with a felony is not represented by counsel, before he is required to plead the judge of the superior court shall advise the defendant that he is entitled to counsel. If the judge finds that the defendant is indigent and unable to employ counsel, he shall appoint counsel for the defendant. . . ."

In 1968, however, decisions of the Supreme Court had extended the constitutional right to counsel to all defendants charged with "serious misdemeanors." As a result, in *Morris*, this Court defined a serious misdemeanor as one for which the authorized punishment exceeded six months, and extended the requirements of G.S. 14-4.1 to serious misdemeanors. Thus, that

statute was interpreted as requiring the judge of the superior court (1) to advise any defendant who was without counsel and charged with a felony or serious misdemeanor that he was entitled to counsel, (2) to ascertain whether the defendant was indigent and unable to employ counsel, and (3) to appoint counsel for an indigent defendant unless he had intelligently and understandingly waived his right to counsel. These requirements are essentially those of G.S. 15A-942, and the decision in *Morris* dictates the decision in this case.

Speaking for the Court in *Morris*, Justice Huskins said: "[D]efendant was represented by privately employed counsel in the Recorder's Court of Thomasville and on appeal to the Court of Appeals and to this Court. Yet in the trial of his case before a jury in the superior court he had no counsel. Was he able to employ counsel? Was he indigent? Did he request appointment of counsel? Did he waive the right to counsel? The record is silent. Waiver of counsel may not be presumed from a silent record.

. . .

"For failure of the trial judge to determine indigency and appoint counsel to represent defendant if indigent, the judgment must be vacated and a new trial ordered. At the next trial if defendant is not represented by privately employed counsel, the presiding judge shall (1) settle the question of indigency, and (2) if defendant is indigent, appoint counsel to represent him unless counsel is knowingly and understandingly waived. These findings and determinations should appear of record." *Id.* at 59-60, 165 S.E. 2d at 251-52. This must also be our judgment in the instant case.

Finally, we are impelled to say that prejudice which defendant suffered throughout his trial from lack of counsel is obvious from the record. While defendant was able to give a forthright version of his side of the story when his time came, he was unequal to the task of cross-examining Clark, the confessed housebreaker and thief who had sold him the television and who was testifying for the State prior to being sentenced. *A fortiori*, defendant was unable to cope with the trial judge's questioning of defense witness Batchelor, Clark's confederate who was also awaiting sentencing.

As set out in the preliminary statement of facts, on direct examination in response to a question from defendant, Batchelor

said, "It is true that when Keith [Clark] and I brought the TV to your house that Keith said it 'won't hot.'" Then in response to Judge Cowper's question, "What did Clark tell this defendant?" Batchelor said he had heard Clark tell defendant "where it [the TV] come from and told him it won't hot." The judge then said, "He told him where it came from?" and Batchelor replied, "Yes, sir." We have no doubt that this exchange between the judge and the witness left the jury with the impression that defendant's own witness was saying that he had heard Clark tell defendant that the TV came from Winstead's home. Yet this was not what the witness said; and we note further that Clark himself testified that he had told defendant the TV came from a "poker house" and that on cross-examination Batchelor said that all he had heard Clark say "was that it won't hot" and Clark had said that "uptown." We apprehend that Batchelor's response to the judge, added to Officer Ream's incompetent hearsay testimony that Clark told him defendant "knew the television set was stolen because he told him that he stole it," sealed defendant's fate.

As heretofore noted, defendant interposed no objection during his entire trial and, at the end, he waived the right to argue his case to the jury — an opportunity which any trial lawyer would have seized to stress the several points which might have been made in favor of defendant who, according to the evidence, had no prior criminal record.

Defendant's conviction is set aside, and the case will be remanded to the superior court for a new trial in accordance with this opinion.

New trial.